IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | |
| PHILLIP EDMUND BARNARD, JR., | ) | 1:15-cr-60 (LMB) |
| | ) | 1:16-cv-1283 (LMB) |
| Movant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

Movant Phillip Edmund Barnard, Jr. ("movant" or "Barnard"), acting pro se, has filed a Motion to Vacate Under 28 U.S.C. § 2255 ("Motion to Vacate") [Dkt. 88],[1] in which he challenges the effectiveness of his trial counsel, the conduct of the government, the sufficiency of the evidence introduced at his trial before he pleaded guilty, and the validity of his guilty plea. The government filed an opposition ("Gov. Opp.") [Dkt. 104], to which movant has replied ("Rep.") [Dkt. 110]. For the reasons that follow, the Motion to Vacate will be dismissed.

I. BACKGROUND

On February 26, 2015, Barnard was indicted on one count of wire fraud in violation of 18 U.S.C. § 1343 and three counts of money laundering in violation of 18 U.S.C. § 1957. [Dkt. 1]. The indictment alleged that Barnard operated a charitable foundation and a series of companies that purported to invest and engage in various forms of exploration and speculation, particularly for gold and other precious natural resources. Id. at ¶¶ 3–6. Barnard allegedly persuaded a number of persons to "invest" in these enterprises, promising a high rate of return and low risk.

---

[1] Accompanying the Motion to Vacate are a Memorandum and Grounds for Relief ("Memo.") [Dkt. 89], an "Affidavit" in support that has not been notarized ("Aff.") [Dkt. 90], and a set of Documents in Support ("Docs.") [Dkts. 88-1, 88-2].

Id. at ¶¶ 7–11. According to the indictment, Barnard actually used the money primarily for "personal purposes including, but not limited to, hotels, entertainment, educational expenses, food, and travel." Id. at ¶ 12.

At trial, Barnard was represented by Vaughan C. Jones ("Jones"). The thrust of Barnard's defense was that the transactions were legitimate but as-yet unsuccessful.[2] To present that defense at trial, Barnard hoped to call several witnesses who would purportedly buttress the bona fides of his financial dealings. Unfortunately for Barnard, many of his witnesses had other ideas. Although Jones sent subpoenas to every witness that Barnard requested, "most witnesses were evasive and unreliable" and "[m]any proposed witnesses steadfastly refused to corroborate positions supported by Barnard." Jones Decl., [Dkt. 104-1] at ¶ 15. After some witnesses were asked to testify, they "became angry and accused [Barnard] of lying to them about why he wanted them to speak with his lawyer." Id. at ¶ 16. Others "avoided service of subpoena" altogether and still others "threatened to testify directly adverse to [Barnard's] positions." Id. at ¶ 17.

The trial began on July 20, 2015. The government called several victims of Barnard's scheme to corroborate its allegations of fraud. For example, Mark Cantor ("Cantor"), whose daughter played soccer with Barnard's daughter, testified that Barnard approached him about investing in a deal involving gold. Tr. at 234:8–235:22. Barnard represented that he had successfully completed similar transactions "numerous times," and promised zero risk and a 150% return in about three months. Id. at 235:17–238:11. Another witness, Loren Schaeffer ("Schaeffer") testified about similar representations. Barnard told her that he had completed

---

[2] According to Jones, Barnard's initial theory of the case was that "a substantial multi[-]million dollar return on the investment would occur during trial and that [the] defense should be that his investors should patiently wait for this imminent payment." Jones Decl, [Dkt. 104-1] at ¶ 8.

2

about eight gold transactions in the past and that her rate of return on a no-risk investment with him would eventually reach 1500%. Id. at 379:10–395:24. After Schaeffer invested funds, Barnard dismissed her inquiries about when she would begin seeing a return. Id. at 396:1–398:1. She ultimately had to file for bankruptcy. Id. at 423:12–13.

The government also presented evidence that Barnard ensnared his alma mater Virginia Polytechnic Institute and State University ("Virginia Tech") in his scheme. Lay Nam Chang ("Chang"), Dean of Virginia Tech's College of Science, testified that Barnard convinced the school he was going to donate $30 million to fund a new geosciences building. Tr. at 470:18–473:9. This understanding led Virginia Tech to fly him to campus on its private plane, cover his accommodations and dinners on various occasions, and publicly announce the planned building. Id. at 467:11–471:25. During these visits, he also convinced Professor Barbara Bekken ("Bekken") to invest "in the process of bringing gold to market," this time promising a 100% return. Id. at 509:15–513:14.

A forensic accountant employed by the Federal Bureau of Investigation ("FBI"), Stephanie Anderson ("Anderson"), testified that Barnard's bank accounts were generally near a zero balance shortly before he received money from his victim investors. Tr. at 639:23–630:3. She traced the proceeds of those "investments" showing that Barnard used those funds to purchase consumer goods from vendors with no evident connection to the gold industry such as Montgomery County Liquor, Giant Food, Arby's, Bed, Bath & Beyond, and Amoco Oil. Id. at 643:1–11. Barnard also spent "invested" money on his daughter's tuition at a private school. Tr. at 647:13–16. At no point during trial did the defense present any evidence that Barnard had ever completed a single gold transaction.

3

Behind the scenes, Jones continued to struggle with the proposed defense witnesses and evidence. Barnard repeatedly told Jones that various transactions would demonstrate that his enterprise was legitimate, but when Jones asked Barnard for documentation of those transactions, Barnard "asserted that he did not know [Jones] needed that specific document" and would "return[] to [Jones'] office the following day with documents consistent with [Jones'] request." Jones Decl., [Dkt. 104-1] at ¶ 13. This pattern caused Jones "to have concerns about the authenticity of those documents and [his] ethical ability to introduce them as evidence." Id. Moreover, Jones' "communication with the alleged signatories on many documents revealed that the documents could not be authenticated for admission at trial." Id. at ¶ 12.

As the defense neared the end of its case-in-chief, during the afternoon of the third day of trial, the remaining two defense witnesses were not in the courthouse, despite having been served with subpoenas. Jones proffered that one of the witnesses, Mumtaz Khan ("Khan"), was "a witness who had a long series of dealings with Mr. Barnard that goes on for years" and was "connected to the royal family of an Indonesian country." Tr. at 828:3–6. Jones expected another witness, Sonny Belew ("Belew"), to testify about "similar transactions" in which Belew was on the verge of making a payment to Barnard, which would have enabled Barnard to begin paying out to the victim investors. Id. at 831:5–15.

The Court reviewed the FBI's reports of investigation ("ROIs") from its interviews with those witnesses and concluded that the testimony of the missing witnesses would not have aided movant's case. When asked about that interpretation of Khan's ROI, Jones replied:

> What I was going to say is I am very much aware of the negative information in the [ROI]. I am very much aware of the inference that any reasonable attorney would take from a person choosing not to speak with them in the three months leading up to the trial.

4

> I will only say that my client has provided documents that I think that Mr. Khan would have to acknowledge. And the documents would then speak for themselves regardless of his satisfaction with being present for court.

Tr. at 837:6–14. The Court denied a continuance, stating:

> I'm making a judgment call that it is inconceivable to me that these witnesses, were they here, could have added anything that would help the defense.
> You've got Khan admitting that the letter that Mr. Barnard wanted him to send to Virginia Tech was false and they both knew it was false. That kind of stuff is not going to help your case[.] . . . Belew absolutely adds nothing to your case. These [witnesses] will not . . . help you. And, therefore, I don't see how there is prejudice to the defendant in these witnesses not being here.

Id. at 837:25–838:14.

Following this exchange, Jones announced Barnard's intent to testify on his own behalf. The Court asked Barnard whether he felt he had enough time to consider that decision, and whether he knew that untruthful testimony could impact his sentence if he were to be found guilty. Tr. at 840:15–841:6. Barnard responded in the affirmative to both questions, but asked for "two minutes" to talk to Jones. Id. at 840:15–841:9. According to Barnard, during this conversation Jones asked him "'Are you really going to [testify] against the advice of your counsel and your family?" Aff. 36.

While Barnard and Jones were conferring, the Court asked the government whether any progress had been made in locating the missing witnesses. The government had managed to contact Khan, who said that he sat outside the courtroom on the first day of trial but was not told he needed to return and consequently left the state. Tr. at 841:15–24. He offered to testify by telephone from New York. Id. at 842:4–5. The Court asked Jones about the possibility of Khan testifying by phone, to which Jones replied, "We were going to try to introduce 50 documents through [Khan]," making it clear that testimony by phone was impracticable. Tr. at 843:11–24.

5

Jones was then given five more minutes to speak with his client. Id. at 844:1–3. Before that recess, the Court advised the defense that "it's not an automatic practice with this judge to necessarily increase the offense level if a defendant is found guilty even if he has testified." Id. at 844:16–19. After the recess, Jones was allowed to move the documents into the record that he hoped to enter through Khan and Belew. Id. at 846:13–14. After those documents were moved in, the government requested another five to ten minute recess. Id. at 848:25–849:1.

At the conclusion of this second recess, Jones advised that his client had decided to accept a plea agreement offered by the government. Tr. at 849:12–17. The Court released the jury and took over an hour recess so that the plea documents could be prepared. Id. at 852:9–25. This recess was not the only time in which Jones and Barnard had discussed the terms of a plea agreement. According to Jones, "On the day [Barnard] accepted the plea he was not presented with any issue that had not been explained to him months earlier." Jones Decl., [Dkt. 104-1] at ¶ 27.

After the recess, the Rule 11 colloquy began, with Barnard affirming to answer truthfully under the penalty of perjury and reporting that he was 54 years old, held an undergraduate degree and had completed some Ph.D. coursework, was fluent in English, was not suffering from any mental or physical health problems, and had not taken any medication in the previous 24 hours. Tr. at 853:17–854:15. The Court then turned to whether he had read the plea agreement:

> THE COURT: We have in court this evening a written plea agreement. And the agreement is 13 pages long. And I see what appears to be your signature at the top of page 13. Did you in fact sign the written plea agreement?
> THE DEFENDANT: Yes.
> THE COURT: Now, before you signed the plea agreement, because I know this was done somewhat at the last minute, have you had enough time to read the agreement over for yourself word for word?
> THE DEFENDANT: Yes.
> THE COURT: And have you had enough time to thoroughly discuss it with your attorney, Mr. Jones?

THE DEFENDANT: Yes.
THE COURT: Now, I want to just ask this, Mr. Jones, have there been previous efforts to work out a plea in this case?
MR. JONES: Yes, Your Honor.
THE COURT: Is the plea bargain that's in court today at all similar or close to some of those earlier efforts?
MR. JONES: I would classify it as similar to those, Judge.
THE COURT: And when you were working on other attempts, had you been discussing with Mr. Barnard the kinds of things that would be in the plea agreement?
MR. JONES: Yes, ma'am.
THE COURT: All right. And the reason I'm asking you this question, Mr. Barnard, is because normally there is more time for a defendant to evaluate a plea offer. I just wanted to make sure that certain aspects of this plea agreement had been previously discussed with you in the context of other possible plea agreements. Is that correct?
THE DEFENDANT: Yes.
THE COURT: All right. Now, do you feel that you have had enough time to ask Mr. Jones all the questions that you have about this plea agreement?
THE DEFENDANT: Yes.
THE COURT: Has he answered all of those questions to your satisfaction?
THE DEFENDANT: Yes.
THE COURT: Are there any questions you want to ask me about the plea agreement?
THE DEFENDANT: No.
THE COURT: And you realize that at any point during what we call a plea colloquy you can stop and ask questions either of Mr. Jones or the Court? Do you understand that?
THE DEFENDANT: Yes.
THE COURT: All right. Now I want you to look at page 13. I assume you have a copy of the plea agreement there with you. That's the page that has your signature. And there are two sentences that are right above your signature. I want to make sure you can see those. They go, "I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this agreement and voluntarily agree to it." Do you see those two sentences?
THE DEFENDANT: Yes.
THE COURT: Are they completely true in every respect?
THE DEFENDANT: Yes.
THE COURT: Now, by telling the Court that you have read the plea agreement and discussed it thoroughly with counsel, and that you understand it, and you are voluntarily agreeing to it, that means you will be bound by everything that is written in this 13-page document even if I don't go over every paragraph or page of the agreement with you today. Do you understand that?
THE DEFENDANT: Yes.
THE COURT: And the reason for that result is that this plea agreement is really a written contract between you and the United States Government. And when a

> person signs a written contract after he has carefully reviewed it himself, and reviewed it with his counsel, and he understands it when he signs it, and he signs it voluntarily, then that becomes a binding legal document. And you can't just come back to court in a couple weeks and say, well, I thought more about it, I don't like what's on page 4. It's just too late. Do you understand that?
> THE DEFENDANT: Yes.

Id. at 854:16–856:13. The Court then confirmed that the defendant understood the written plea agreement to be his "complete agreement" with the government, meaning he did not believe there were any side deals outside the agreement. Id. at 857:21–858:13.

After reviewing the offenses that Barnard had agreed to plead to, and his maximum statutory exposure, the Court clarified that any agreement between him and the government regarding sentencing would not bind the Court. Tr. at 862:22–863:4. The exchange continued:

> THE COURT: I want to make sure you understand that no matter what Mr. Jones may have told you he thinks your sentence may be, or for that matter if the prosecutors, or the case agent, or anybody else has said, well, you're probably looking at such-and-such a sentence, none of those discussions are binding on the Court. Do you understand that?
> THE DEFENDANT: Yes.
> THE COURT: And so, if at the sentencing hearing you receive a sentence that is different from what you might be expecting or hoping for, that does not constitute a violation of your plea agreement and it would not give you a basis to withdraw your guilty pleas. Do you understand that?
> THE DEFENDANT: Yes.

Id. at 865:24–866:13.

The Court also confirmed that the defendant understood that he was giving up his right to appeal the conviction and any sentence below the statutory maximum, Tr. at 866:14–867:6, and cautioned Barnard that if he filed an appeal, "it [would] be summarily dismissed by the Court of Appeals because [he was] giving up [his] right to appeal in th[e] plea agreement." Id. at 867:12–16.

The colloquy also addressed Barnard's relationship with Jones:

8

THE COURT: ... [H]ave you had enough time to tell Mr. Jones everything you
know about this case?
THE DEFENDANT: Yes.
THE COURT: Has he discussed with you the nature of these charges and any
ways in which you could possibly defend yourself against these charges if you
continued with this trial? In other words, you've been almost through the entire
trial. There is a little bit left in terms of closing arguments and instructions. And
of course, he is a very eloquent attorney, and he will make as good an argument as
he can. But I just want to make sure that you feel that he has discussed with you
all your various options in this respect?
THE DEFENDANT: I think so.
THE COURT: All right. And again, for the record, Mr. Jones, did you get
complete discovery in this case?
MR. JONES: Yes, Your Honor, absolutely.
THE COURT: And it sounds as though you certainly shared all that with your
client?
MR. JONES: Absolutely, Judge.
THE COURT: And again, was this the best plea bargain you could get for your
client?
MR. JONES: I feel very comfortable and very satisfied that this plea bargain—or
plea was offered and was accepted [sic].
THE COURT: All right. Mr. Barnard, are you fully satisfied with the way in
which Mr. Jones has worked for you in this case?
THE DEFENDANT: Yes, ma'am.

Tr. at 870:21–872:1.

The Court then went over the procedural rights Barnard was giving up by pleading guilty:

THE COURT: ... You've been in trial for three days, but I just want to make
sure, I'm going to go through the standard waiver of trial rights even though we
have really been through the trial. Do you understand you still have the right at
this time to stop this plea bargain and continue with your trial?
THE DEFENDANT: Yes.
THE COURT: All right. And if you continued with this trial, then ... you would
still have the opportunity to, as I say, have your attorney argue this case. You
would still have the opportunity, if you wanted to, to testify at the trial. Do you
understand that?
THE DEFENDANT: Yes.
...
THE COURT: All right. And do you understand that if you had been found
guilty by this jury, you would have a right to appeal that finding of guilt to a
higher level court? But that by pleading guilty today, you're giving up your right
to appeal your convictions.
THE DEFENDANT: Yes.

9

THE COURT: And do you understand that a guilty plea also waives any and all attacks, other than jurisdictional attacks, on the case? So any issues that you could possibly have raised, any attacks about the indictment, any issues about the witness issues that came up during the trial, any of the Court's rulings during the trial, all of that is waived. Do you understand that? And waived means given up. So that you can't down the road file an appeal and say, well, I had to plead guilty because these two witnesses weren't available, or I had to plead guilty for various reasons. The only attack you would still have, the law always allows a defendant to attack any jurisdictional issue. And that's all you would have left. Do you understand that?
THE DEFENDANT: Yes.
THE COURT: Did you want to discuss that with Mr. Jones at all?
NOTE: A discussion is had between the defendant and his counsel.
THE DEFENDANT: Yes.
THE COURT: Do you understand that?
THE DEFENDANT: Yes.

Tr. at 872:2–874:17.

The Court then turned to the written statement of facts accompanying the plea agreement:

THE COURT: ... We have a written statement of facts which has also been filed this evening. And the statement of facts is 16 pages long. And I see your signature, Mr. Barnard, on page 16. Did you in fact sign the statement of facts?
THE DEFENDANT: Yes.
THE COURT: Now, did you read that statement of facts over extremely carefully? You have had, I guess, about an hour or an hour-and-a-half to go over this plea agreement. But did you read the statement of facts over carefully?
THE DEFENDANT: Yes.
THE COURT: Do you understand that your signature on the statement of facts acknowledges, number one, the truth of everything that's written in the 102 numbered paragraphs? And you're also admitting by signing the statement of facts that if the case had gone to trial or the trial had been finished, the Government would have proven every one of those facts beyond a reasonable doubt. That's what your signature means on this statement. Do you understand that?
THE DEFENDANT: Yes.
THE COURT: So if there is anything in this statement of facts that you want to change or that you dispute, you've got to tell me now because this is also the document the Probation Office will use for the description of the offense. And sometimes defendants do make changes during the plea colloquy. So I want to make sure that you have time to make your record.
NOTE: A discussion is had between the defendant and his counsel.
THE DEFENDANT: Yes.
THE COURT: Mr. Barnard, is there anything you want to change?
THE DEFENDANT: No.

10

> MR. JONES: Judge, again, to reassure the Court given the time frame of this plea and the statement of facts, I wanted to bring to the Court's attention that the language in the statement of facts is very close to identical to the language that was in indictment [sic] that has been in the possession of me and Mr. Barnard for several months. So in addition to the time we spent reading it today when it was put into this format as a statement of facts, we have gone over every word of the elements that are in this statement.
> THE COURT: All right. Mr. Barnard, do you agree with that?
> THE DEFENDANT: Yes.
> THE COURT: All right. And you understand you can't come back in a couple weeks and say, you know, that wasn't wire fraud, or I never intended to deceive. I mean, you are conceding all of that by signing this statement of facts. Do you understand that?
> THE DEFENDANT: Yes.

Tr. at 874:18–876:21.[3]

Finally, the Court asked about the voluntariness of Barnard's plea:

> THE COURT: ... Do you believe in any respect that you've been—do you believe in any respect that you've been pressured into entering into this plea agreement? You have got to be honest with your answer, Mr. Barnard.
> MR. JONES: May I speak with him?
> NOTE: A discussion is had between the defendant and his counsel.
> THE DEFENDANT: No ma'am.

Tr. at 876:22–877:5. Barnard then pleaded guilty to all four counts in the indictment, and the Court found that his guilty pleas were done knowingly and voluntarily. Tr. at 877:11–878:25.

Following the guilty plea, Barnard's relationship with Jones broke down. Barnard now claims that Jones was aware of all the adverse developments that would take place at trial and did nothing to stop them from occurring. Aff. 40. He also alleges that after his guilty plea he received additional "FBI reports" from the government, which convinced him that Jones was working with the government to induce him to plead guilty. Id. Accordingly, Barnard fired Jones before the probation office completed preparing the Presentence Investgiation. Id.

---

[3] Despite this exchange, and the earlier one regarding the plea agreement, Barnard now alleges that he was not shown complete copies of either document until August 2015, several weeks after his plea. Aff. 40.

11

Barnard alleges that, after being fired, Jones confronted him outside the probation office, when his pre-sentence interview was to take place. Aff. 40. According to Barnard, this "placed [him] in the awkward position of having to reject his services in [the probation officer's] presence," which Barnard feels "no doubt served to prejudice [him] with [the probation officer] before the interview had even started[.]" Id. at 40–41.

After Barnard fired Jones, Kenneth P. Troccoli ("Troccoli") of the Federal Public Defender's office was appointed to represent Barnard at sentencing. Barnard has not alleged that Troccoli rendered ineffective assistance of counsel. At the sentencing hearing on October 13, 2015, the government argued for two-point enhancements for obstruction of justice and vulnerable victims, and the defense argued for a two-point reduction for acceptance of responsibility. The Court rejected both sides' arguments, accepting the 51 to 63 months guideline range calculated by the probation officer, and imposed 63 months of imprisonment, followed by three years of supervised release a condition of which was that Barnard satisfy an $816,612.00 restitution order.

Barnard did not file a direct appeal, but did file a timely § 2255 motion on October 11, 2016; however, the 88-page memorandum in support exceeded this court's page limits. See Local Rule 7(F)(3). As a result, Barnard was required to submit the motion in compliance with the page limits, which he did on November 11, 2016.[4] He simultaneously filed a Motion for Recusal which has been addressed in a separate order.

## II. DISCUSSION

Barnard's Memorandum identifies five grounds for relief: (1) "Conflict of Interest;" (2)

---

[4] Barnard has repurposed much of the material originally filed as part of the overly long § 2255 in a 44-page "Affidavit" and 38-page preface to his "Documents" filed along with the revised version, but the "Memorandum" filed along the new motion does comply with the 30-page limit.

"Prosecutorial Misconduct;" (3) "Judicial Bias;" (4) "Ineffective Assistance of Counsel;" and (5) "Denial of a Fair Trial under the Due Process of Law." See generally Memo.

### A. **Barnard's Arguments**

Barnard's first ground for relief, "Conflict of Interest," asserts that the United States Government, and particularly former Vice-President Dick Cheney, was pursuing transactions with the same Indonesian royal family as the one with whom Barnard was dealing, creating "obvious Conflicts of Interest that existed [that] should have prevented the United States Government from prosecuting this case against Barnard." Memo. 1–2.

In his "Prosecutorial Misconduct" claim, Barnard accuses the government of manifold misconduct before and during his trial. This category is subdivided into allegations that the government presented false or misleading evidence by creating "False FBI [ROI] Witness Reports on all prospective witnesses in order to influence all witnesses," id. at 4; threatened, badgered, or tampered with 13 out of Barnard's 14 proposed witnesses, especially Khan, id. at 7–8; used untruthful witnesses, id.; engaged in selective and vindictive prosecution, id. at 10; failed to disclose evidence that would have exonerated Barnard,[5] id. at 11; and hid, destroyed, or tampered with evidence, case files, or court records,[6] id. at 11–12.

Barnard's "Judicial Bias" claim alleges that the Court "came to the trial of the opinion that Barnard was guilty and repeatedly showed that opinion" during trial. The arguments duplicate those in Barnard's Motion for Recusal, which are addressed in a separate order denying that motion.

---

[5] In this category, Barnard does not allege that the government was in possession of exculpatory information that it failed to turn over to him; rather, he argues that the government failed to introduce to the jury purportedly exculpatory evidence he had provided. Memo. 11.

[6] This category primarily addresses a single page from Khan's ROI, which Barnard alleges was missing from the version that was produced during discovery.

13

Barnard's "ineffective assistance of counsel" claim recites a laundry list of grievances against Jones, essentially complaining that Jones did not spend enough time with the case; did not understand the nature of Barnard's businesses; did not adequately portray those businesses as legitimate; and worked in collusion with the government to persuade Barnard to plead guilty by systematically depriving him of witnesses and evidence over a period of months. Memo. 16–28. Regarding the decision to plead guilty, Barnard alleges that his:

> ultimate decision to plead guilty was the result of coordinated coercion against Barnard from April through the last day of trial. The Government and Attorney Jones stripped him of all key witnesses, all key documentary evidence, and all of the benefits of being defended by effective counsel at trial. Their efforts left Barnard broken and defeated in front of his family in Court. Attorney Jones knowingly allowed Barnard to suffer from the effects of cruel circumstances he personally helped to create for Barnard.

Memo. 27. The documents[7] attached to Barnard's § 2255 motion identify, without additional factual discussion, eight occasions on which Jones "attempt[ed] to coerce Barnard into pleading guilty," culminating in his guilty plea on July 22, 2015. Docs. 30–31. Barnard also alleges that Jones permitted an Assistant United States Attorney to visit Jones and Barnard as Barnard was deciding whether to plead guilty and write five additional charges that the government might bring against Barnard if he did not plead guilty and chose instead to testify on his own behalf. Aff. 36–37.

Barnard's fifth and final ground for relief, "Denial of a Fair Trial under the Due Process of Law," recapitulates the first four grounds by arguing that he "was subjected to the prejudice of an obvious conflict of interest, egregious acts of prosecutorial misconduct, the damaging hand of judicial bias and the deficient results of ineffective assistance of counsel." Memo. 28.

---

[7] Barnard's Documents are prefaced by 38 pages of "charts" prepared by Barnard that simply list the errors described in his Memorandum in exhaustive detail.

## B. Effect of Guilty Plea

It is well-settled that an unconditional guilty plea ordinarily forfeits any attack on a criminal judgment beyond an attack on the jurisdiction of the court or the voluntariness of the plea. Tollett v. Henderson, 411 U.S. 258, 267 (1973). This principle alone disposes of the lion's share of Barnard's arguments. For example, Barnard's attacks on the sufficiency or veracity of the evidence admitted at trial, the Court's decisions regarding the missing witnesses, any pre-plea prosecutorial misconduct, and any deprivation of a "fair trial" are all forfeited.

Because Barnard acknowledged on the record during his plea colloquy that he was fully satisfied with Jones' conduct, Tr. at 871:23–872:1, his is barred from claiming ineffective assistance of counsel based on deficiencies that "were apparent . . . at the time" the plea was entered. Gao v. United States, 375 F. Supp. 2d 456, 464 (E.D. Va. 2005). Accordingly, Barnard's list of errors that Jones purportedly made in preparing for and trying the case, unrelated to the decision to plead guilty, are all foreclosed by Barnard's guilty plea, which included his statement that he was fully satisfied with Jones' conduct.

Moreover, Barnard fails to show that his guilty plea was either unknowingly made or involuntary given that the Court advised him of the consequences of pleading guilty during the colloquy, consequences which Barnard acknowledged:

> THE COURT: And do you understand that a guilty plea also waives any and all attacks, other than jurisdictional attacks, on the case? So any issues that you could possibly have raised, any attacks about the indictment, any issues about the witness issues that came up during the trial, any of the Court's rulings during the trial, all of that is waived. Do you understand that? And waived means given up. So that you can't down the road file an appeal and say, well, I had to plead guilty because these two witnesses weren't available, or I had to plead guilty for various reasons. The only attack you would still have, the law always allows a defendant to attack any jurisdictional issue. And that's all you would have left. Do you understand that?
> THE DEFENDANT: Yes.

15

Tr. at 873:19–874:10. Having been so advised, Barnard went through with the plea. Accordingly, all the arguments raised in Barnard's first, second, and fifth grounds for relief are barred by his guilty plea. Likewise, any allegations that Jones was ineffective in his functions unrelated to the plea are barred.

### C. Procedural Default

A prisoner seeking collateral relief may not raise an argument that he has not presented on direct appeal without demonstrating "cause" for his failure to raise the issue on appeal and "prejudice" to his case. Bousley v. United States, 523 U.S. 614, 622 (1998). This procedural default rule even applies to claims that a guilty plea is not voluntary or intelligent. Id. at 621 ("[E]ven the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review.").

Because Barnard did not file a direct appeal, all of the arguments that are barred by his guilty plea are also procedurally defaulted. Moreover, his arguments that his plea was not voluntary and intelligent are also procedurally defaulted. Although ineffective assistance of counsel, for failing to appeal, can serve as the necessary "cause," Barnard has not alleged that Troccoli, his counsel at the time that he decided not to appeal, was ineffective.[8]

### D. Knowing and Voluntary Nature of Plea

Even if Barnard's arguments about the knowing and voluntary nature of his plea were not procedurally defaulted, they fail on the merits.

---

[8] Under Roe v. Flores Ortega, 528 U.S. 470, 478 (2000), the Supreme Court held that an attorney's decision not to file an appeal is per se ineffective representation if he has either "consulted with the defendant" and "fail[ed] to follow the defendant's express instructions with respect to an appeal," or when the "failure to consult with the defendant itself constitutes deficient performance." The only statement Barnard makes about his failure to appeal is that he "was advised after sentencing not to appeal." Motion to Vacate 11. Although this statement suggests that Barnard consulted Troccoli about whether to appeal, Barnard has not alleged that Troccoli failed to follow any instructions regarding an appeal.

16

"A defendant's solemn declarations in open court affirming a plea agreement carry a strong presumption of verity, because courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." United States v. Lemaster, 403 F.3d 216, 221 (4th Cir. 2005) (internal quotation marks, citations, and modifications omitted). As a result, those statements constitute a "formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 74 (1977). "Thus, in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." Lemaster, 403 F.3d at 221–222.

Barnard now claims that he was coerced into pleading guilty because he was "stripped . . . of all key witnesses, all key documentary evidence, and all of the benefits of being defended by effective counsel at trial" and thereby left "broken and defeated in front of his family in Court." Memo. 27. He also claims he was pressured by the threat of additional charges. Aff. 36–37. This claim directly contradicts his sworn statement during the Rule 11 colloquy, as the following exchange demonstrates:

> THE COURT: . . . Do you believe in any respect that you've been—do you believe in any respect that you've been pressured into entering into this plea agreement? You have got to be honest with your answer, Mr. Barnard.
> MR. JONES: May I speak with him?
> NOTE: A discussion is had between the defendant and his counsel.[9]
> THE DEFENDANT: No ma'am.

Tr. at 876:22–877:5. If Barnard truly felt that the government, or Jones, had fraudulently deprived him of witnesses or evidence, that exchange was the time to say so.[10] Having

---

[9] Barnard has not alleged that Jones said anything that would amount to coercion during this exchange.

17

stated on the record under an affirmation to tell the truth that he did not feel pressured "in any respect," movant's claim is not credible.

Similarly incredible is Barnard's claim that he was not permitted to read the plea agreement or the statement of facts until weeks after his plea, given Barnard's multiple acknowledgements during the plea colloquy that he had read all these documents. See Tr. at 854:16–856:13; 874:18–876:21. Accordingly, Barnard's claims that his plea was not knowing and voluntary will be dismissed.

### E. Ineffective Assistance of Counsel During Plea

Barnard first alleges that Jones was ineffective in counseling him to plead guilty because Jones' deficient performance during the investigative phase and at trial resulted in Barnard being pressured to plead guilty. As discussed above, any defects in Jones' pre-trial and trial conduct were forfeited by Barnard's guilty plea and his statement that he was fully satisfied with Jones' conduct up to that point. Gao, 375 F. Supp. 2d at 464.

He alleges that after his guilty plea he learned in August 2015 by reading FBI ROIs that Jones was engaged in a conspiracy with the government to deprive him of key witnesses, especially Khan, and in direct conflict with statements made during his colloquy he alleges that Jones did not provide him with copies of the plea agreement and statement of facts until August 2015, after he had pleaded guilty.

Allegations in a § 2255 motion may be summarily dismissed when they are "so palpably incredible, so patently frivolous or false as to warrant summary dismissal." United States v. White, 366 F.3d 291, 296–97 (4th Cir. 2004) (internal quotations marks and citation omitted).

---

[10] Before the colloquy ended, the Court asked Barnard separately as to each count whether he made any claim of being innocent of the count, to which, each time, he answered "No" and pleaded guilty to the count. Tr. at 877:11–878:6.

Moreover, purely speculative allegations are insufficient to state a claim for relief. See Fed. R. Civ. P. 8; Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).

Barnard's claim regarding a conspiracy between Jones and the government is both "palpably incredible" and purely speculative. The claim proceeds along these lines: after his plea, Barnard asked Jones to give him all the ROIs. The ROIs regarding Barnard's witnesses, in particular Khan, were so contrary to Barnard's understanding of what the witnesses would testify that the FBI must have fabricated them. Jones, having read the ROIs himself, must have reached the same conclusion, and the only explanation for his failure to address this fabrication is that Jones was in league with the government. This claim involves three layers of speculation by Barnard: first, that the FBI invented the reports; second, that Jones recognized the invention; and third, that Jones' failure to challenge the invented reports means he was conspiring with the government. Such conjectures are not sufficiently "plausible" to state a claim under the standard of Iqbal, and they are "palpably incredible" such that an evidentiary hearing is not necessary, particularly in light of the affidavit from Jones flatly denying the allegations. See Jones Decl., [Dkt. 104-1] at ¶ 2. As explained above, Barnard's statement that Jones did not provide him with copies of his plea agreement and the statement of facts until August directly contradict his repeated averments during his plea colloquy that he had read them, and are therefore similarly incredible. Lemaster, 403 F.3d at 221–22. Accordingly, movant's remaining claims of ineffective assistance of counsel will be dismissed.

### F. Judicial Bias

Barnard's arguments of "judicial bias" are virtually identical to those raised in his Motion for Recusal. To the extent that such arguments could survive a guilty plea and the procedural default rule, they are rejected for the reasons stated in the order denying the Motion for Recusal.

### III. CONCLUSION

For the reasons stated above, the Motion to Vacate will be dismissed by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 14th day of April, 2017.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge